UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HANS KISSLE COMPANY, LLC., and ) ONEBEACON AMERICA ) INSURANCE COMPANY )     Plaintiffs, ) v. ) ) NATIONAL UNION FIRE ) INSURANCE COMPANY OF ) PITTSBURGH, PA )     Defendant ) | Civil Action No. 1:10-cv-11468-NMG |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR OPPOSITION TO
MOTION OF NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH,
PA TO DISMISS AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)
AND IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT**

Now come the Plaintiffs, Hans Kissle Company, LLC ("Hans Kissle") and OneBeacon

America Insurance Company ("OneBeacon") (collectively, "Plaintiffs"), and hereby submit this

Memorandum of Law in Support of Their Opposition to the Motion of National Union Fire

Insurance Company of Pittsburgh, PA ("National Union") to Dismiss Amended Complaint

Pursuant to Fed. R. Civ. P. 12(b)(6) and in Support of Their Cross-Motion for Summary

Judgment.

As grounds, Plaintiffs state that National Union's Motion to Dismiss and its declination

of coverage under the applicable insurance policy is based on the sole grounds that Julio Mora

("Mora"), the plaintiff in the underlying litigation, was an employee of National Union's insured,

Preferred Staffing, Inc ("Preferred"), and that the insurance policy excludes coverage to injuries

to Preferred's employees. The uncontested evidence in the underlying case—including the

deposition testimony of National Union's own insured—demonstrates that Mora was Hans

Kissle's employee under Massachusetts law. As such, the only exclusion relied upon by National

Union is inapplicable, National Union's motion to dismiss must be denied and Plaintiffs are entitled to summary judgment on Counts I, II, III and V of their Amended Complaint.

To the extent that the Court finds it necessary to address National Union's position that Plaintiffs may not maintain under Count IV of their Amended Complaint a so-called "direct action" against National Union without first obtaining a judgment against Preferred, Plaintiffs state that Count IV does not seek a direct recovery from the defendant. Rather it seeks a declaration that a recovery for breach of contract against its insured is covered under the subject policy. Count IV is founded upon the Declaratory Judgment Act, 28 U.S.C. § 2201. National Union's argument is without merit since an actual controversy exists between the parties, and damages have been suffered. As a result, it is appropriate for resolution by this Court.

## FACTUAL BACKGROUND[1]

### 1. Mora's Personal Injury Action and Hans Kissle's Claim Against Preferred

Julio Mora ("Mora"), the plaintiff in the underlying tort litigation, alleges that he injured his hand while attempting to unclog a meat grinder he was operating at the premises of Hans Kissle on April 20, 2007, where he was working as a temporary worker after having been sent to Hans Kissle by Preferred. Exhibit A, Mora's Amended Complaint at ¶ 6, 11; Exhibit B, Answer of Plaintiff, Julio Mora, to Defendant's, Hans Kissle Company, LLC, First Set of Interrogatories, Ans. No. 7.[2] Mora subsequently brought suit against Hans Kissle in negligence and later added breach of warranty claims against the grinder's manufacturer and dealer. Ex. A, Mora's Amended Complaint. Mora's personal injury lawsuit is currently pending in the Massachusetts Superior Court, Essex County, C.A. NO. 07-1361-A ("the underlying litigation").

---

[1] All facts set forth herein and in Plaintiffs' Statement of Material Facts are stated for purposes of this opposition and cross-motion only. Plaintiffs reserve the right to contest all facts and to raise any legal objections to their admissibility in subsequent motions, hearings and at trial, as well as the right to present alternative arguments.

[2] All references to exhibits are to those exhibits attached to the Affidavit of Kevin O'Leary, submitted herewith.

Hans Kissle filed a third-party complaint against Preferred in the underlying litigation after Preferred's insurer, National Union (defendant in this action) refused to defend and indemnify Hans Kissle with respect to Mora's claims against it. Exhibit C, Third Party Complaint. Hans Kissle's action against Preferred was founded on its breach of an Indemnity and Insurance Agreement it had entered into with Hans Kissle in which Preferred agreed to defend, indemnify and hold harmless Hans Kissle from and against any and all claims arising out of or in any way connected with Hans Kissle's purchase or use of Preferred's services. Exhibit D, Indemnity and Insurance Agreement at ¶ 2. The Indemnity and Insurance Agreement further required Preferred to purchase and maintain general liability insurance to include contractual indemnity coverage and to name Hans Kissle as an additional insured thereto. Ex. D, Indemnity and Insurance Agreement, at ¶ 3. Preferred has refused to defend and indemnify Hans Kissle in the underlying litigation on the grounds that its insurer, National Union, has itself refused to provide any coverage to Preferred on the grounds that Mora was Preferred's employee. Exhibit E, Preferred's Answer to Third Party Complaint.

On or about May 25, 2006, prior to Mora's accident, National Union issued to Preferred a "Staffing Services Liability Policy," policy number SSL 9519679, effective from May 25, 2006 to May 25, 2007 (the "Policy"), in exchange for the payment of a premium by Preferred. See Exhibit F, Staffing Services Liability Policy. The Policy provides Preferred with coverage for certain liabilities, including but not limited to liability for bodily injury (Id. Section I) and liability for bodily injury assumed by Preferred pursuant to an Insured Contract (Ex. F), Section IV(B). Pursuant to the terms of the Policy, the Indemnity and Insurance Agreement between Hans Kissle and Preferred constitutes an Insured Contract because Preferred "assume[d] the tort liability of another party to pay for bodily injury or property damage to a third person...". See

Ex. F, Staffing Services Liability Policy Section XII(9)(f), and Ex. D, Indemnity and Insurance

Agreement at ¶ 2, 3. The Staffing Services Liability Policy also contains a Blanket Additional

Insured Endorsement pursuant to which Hans Kissle is an Insured. Ex. F, Staffing Services

Liability Policy, Endorsement No. 1.

All of Mora's claims in the underlying litigation were resolved at mediation on

September 30, 2010.[3] Hans Kissle's claims against Preferred, however, have not been resolved.

As such, there is still an actual controversy between Plaintiffs and National Union arising out of

National Union's refusal to indemnify Hans Kissle and to reimburse defense costs, including

attorneys' fees, incurred in the underlying litigation.

### 2. Uncontested Facts in the Underlying Litigation Regarding the Identity of Mora's Employer.

Hans Kissle is a food manufacturer located in Haverhill, MA, and employs approximately

one hundred and twenty five full-time employees. *See* Affidavit of Chuck O'Donnell, ¶ 2

submitted herewith. Hans Kissle utilizes temporary workers to help meet seasonal or short-term

demand. Exhibit G, Deposition of Brian Calkins ("Calkins Depo.") at 176-177. Hans Kissle

hires temporary workers instead of full-time employees due to the seasonality of its business. Id.

The business relationship between Hans Kissle and Preferred[4] began in early 2006 and

ended in approximately August or September of 2007. Exhibit I, Gurry Depo. at 18, 53. There

was no written contract between the parties setting forth the terms of their business relationship.

Ex. G, Calkins Depo. at 92-93; Exhibit J, Deposition of Mary Isberg ("Connelly Depo.") at 224-

---

[3] Counsel for the Plaintiffs apprised National Union of the September 30, 2010, mediation and, on more than one occasion, invited National Union to attend. National Union declined.

[4] Preferred was also known to Hans Kissle as Andover Personnel/Andover Services, and Hans Kissle understood that the two companies were "one and the same." Exhibit H, Deposition of Patricia Sasso, at 13-14; Exhibit G, Calkins Depo. at 18-19. Brendan Gurry, who works for Andover Services, testified that Preferred is essentially a company within Andover Services and that the two entities were "pretty much the same thing to me." Exhibit I, Deposition of Brendan Gurry at 8, 10; 60-61. For ease of reference, Preferred and Andover Personnel are referred to herein simply as Preferred.

225.[5]  Hans Kissle retained Preferred to identify prospective temporary employees to fill

numerous different positions for Hans Kissle, including general labor, opening, shipping and

quality control. Ex. G, Calkins Depo. at 25-26. Hans Kissle hired Preferred "to do the

interviewing process for us [Hans Kissle]" and send Hans Kissle suggested temporary employees

to fill each position. Ex. G at 43-44.  For other positions, including quality control and forklift

operators, Preferred submitted résumés of prospective employees to Hans Kissle, who then

interviewed candidates and decided whom to hire.  Exhibit K, Deposition of Martin Rubeo

("Rubeo Depo.") at 46-48.[6]  Hans Kissle decided how many temporary workers to hire each day

based on the number of workers needed on that particular day. Ex. H, Sasso Depo. at 28.

Preferred never trained, supervised or controlled the work performed by Mora or by any

other temporary worker it sent to Hans Kissle. Ex. I, Gurry Depo. at 34, 110-112, 143-144; Ex.

G, Calkins Depo. at 37-38, 159-161. Preferred Staffing merely informed temporary workers that

they would be working in a "cold, wet environment" at Hans Kissle and that they could not wear

certain types of clothing and jewelry. Ex. I, Gurry Depo. at 90-91. Hans Kissle itself trained all

temporary employees by providing on-the-job training to show them what to do for each task.

Ex. G, Calkins Depo. at 38.  Hans Kissle also provided safety training to its temporary

employees, while Preferred never gave any safety instructions. Ex. I, Gurry Depo. at 110-111;

Ex. G, Calkins Depo. at 38-39.[7]  Preferred only had prospective temporary workers "fill out an

application," "check references on them [the applicants]," "do a background check on the people

---

[5] Mary Isberg has been referred to by her maiden name of Connelly throughout the course of the underlying litigation.  As such, she is referred to here as Mary Connelly to avoid confusion.

[6] Martin Rubeo is the owner of Preferred. Ex. K, Rubeo Depo. at 8. Mr. Rubeo was Brendan Gurry's "boss," and Brendan Gurry was responsible to go to Hans Kissle's plant "on a daily or weekly basis" and act as a "liason" with Hans Kissle. Id. at 14, 58-59.

[7] Hans Kissle had its own safety videos that it required all employees, both full-time and temporary, to view. Ex. G, Calkins Depo. at 38-39.  On one occasion, unrelated to Mora or the accident alleged in this case, Hans Kissle instructed Preferred to show these safety videos to certain temporary workers before they began working at Hans Kissle. Ex. I, Gurry Depo. at 35; 110-111.

or we do drug screens" if requested by the client company and "provide transportation to the temporary employees." Ex. I, Gurry Depo. at 81.

Hans Kissle, not Preferred, had the right to control and in fact controlled and supervised temporary workers' day-to-day job duties at Hans Kissle. Upon arrival at Hans Kissle, temporary workers reported to one of Hans Kissle's assistant supervisors, who checked in and assigned each worker a job for the day. Ex. G, Calkins Depo. at 159-161. Preferred never gave **any** of the temporary workers it sent Hans Kissle any instructions, documents or other information with regard to their work at Hans Kissle. Ex. I, Gurry Depo. at 112. Preferred never made any inquiries to Hans Kissle about job safety or any potential risks temporary workers may face while working at Hans Kissle. Ex. I, Gurry Depo. at 114. Preferred did not determine which temporary workers would be assigned to which jobs, but instead left that decision to Hans Kissle and its supervisors. Id. at 143-144. In addition, Hans Kissle's supervisors would reassign jobs to temporary workers during a shift in order to better meet changing work needs. Exhibit L, Deposition of William Davis ("Davis Depo.") at 73. For example, if one department finished its work early and another needed help, temporary workers would be sent to help the second department. Id. at 73

Hans Kissle also had the right to terminate its temporary employees. When Hans Kissle felt that one of the temporary employees was having difficulty with his or her assigned job or "might not be working out," Hans Kissle informed Preferred and instructed them to send a different worker the next day. Ex. I, Gurry Depo. at 32-33, 95-96. Hans Kissle also told Preferred not to send a particular temporary worker back if that worker "has acted out of line or done something wrong." Ex. G, Calkins Depo. at 190-191; Ex. L, Davis Depo. at 68.

Moreover, Hans Kissle, not Preferred, kept track of the hours worked by its temporary employees. Ex. K, Rubeo Depo. at 115; Ex. G, Calkins Depo. at 43-45. Preferred, however, was paid an administrative fee for the interviewing, payroll, transportation and other services it provided. Ex. I, Gurry Depo. at 65-66. Hans Kissle paid temporary workers, like Mora, who were sent by Preferred and worked as general laborers for $7.50 per hour, for each hour worked at Hans Kissle. Ex. H, Sasso Depo. at 20-21. Preferred Staffing handled payroll duties with respect to temporary workers as part of the administrative services it sold to Hans Kissle. Hans Kissle paid Mora and all other temporary employees directly. Preferred drafted Mora's payroll check and sent the check to Hans Kissle who, in turn, gave the check to Mora. Exhibit M, Deposition of Julio Mora, Volume II ("Mora Depo. Vol. II") at 160 ("The company where we were working, they would give it [the paycheck] to us [temporary workers]."). Preferred also provided transportation to temporary workers, like Mora, who required a ride to work. Ex. I, Gurry Depo. at 81, 89. Hans Kissle paid a higher hourly "bill rate" to Preferred for each of these services. Id. at 61-62; Ex. H, Sasso Depo. at 21.

Mora worked at Hans Kissle on multiple occasions between November 1, 2006, and his accident on April 20, 2007. Exhibit N, Time Records. Although Preferred provided Mora with transportation to Hans Kissle's plant, no one from Preferred ever told Mora what he would be doing or what his job would be at Hans Kissle. Ex. M, Mora Depo. Vol. II at 173. Hans Kissle required Mora to wear specific clothing at work, including gloves, a coat, and a blue or white cap. Id. at 180. Mora's "uniform" was provided by Hans Kissle. Id. Hans Kissle also gave Mora a number that he would use to clock in and out when he arrived at work. Id. at 183-185.

Mora worked in Hans Kissle's salad production department as a temporary opener.[8] Ex. H, Sasso Depo. at 43-44. Hugo DaSilva ("DaSilva"), a full-time Hans Kissle employee, was Hans Kissle's "lead opener" and was in charge of two other employees who would work with him as openers. Exhibit N, Deposition of Hugo DaSilva ("DaSilva Depo.") at 10-11; 22-23; Ex. L, Davis Depo. at 17-18. As lead opener, DaSilva was responsible for overseeing the use of Hans Kissle's grinding machines. Ex. L, Davis Depo. at 17. DaSilva was also responsible for training employees who worked for him, including Hans Kissle temporary employees like Mora, how to use Hans Kissle's grinding machines.[9] Ex. N, DaSilva Depo. at 24, 39.

On the night of his accident and as with all other days on which Mora worked at Hans Kissle, DaSilva was Mora's boss and told him to work on the ham grinding machine. . Ex. M Mora Depo, Vol. II at 164, 166. Mora testified at his deposition that he had been working with the ham grinding machine when two hams got stuck in it. Ex. M, Mora Depo. Vol. I at 37-40. Mora climbed up on to the grinder, looked down into it, saw that two hams were stuck and tried "to get one of the hams unstuck so that the other one would go through," but the hams were "slippery" and his hand ended up getting caught in the machine instead. Ex. M, Mora Depo. Vol. I at 37-40.

---

[8] The "opener" position involved the preparation of raw materials for the next production day. Duties of an opener included grinding products such as eggs, chicken and ham so that they could be further processed the next day. Ex. G, Calkins Depo. at 28-29.

[9] When Mora worked at Hans Kissle, he reported to DaSilva, who was his "boss" or "supervisor" and told Mora what to do each day. Ex. M, Mora Depo. Vol. I at 28-29, 50; Ex. N, DaSilva Depo. at 77 ("Q. So every night that you saw Julio Mora working at Hans Kissle, he worked under your direction? A. Yes."). Every time he worked at Hans Kissle, Mora worked with DaSilva on some kind of grinding machine to grind chicken, eggs or ham. Ex. M, Mora Depo. Vol. III at 47. DaSilva trained Mora on how to use the ham grinder. Ex. N, DaSilva Depo. at 39. Specifically, DaSilva taught Mora how to turn the grinder on by pressing a green button, how to remove the plastic wrap from each individual ham, how to put the ham into the grinder, and to turn it off by pressing a red button. Ex. M, Mora Depo. Vol. I at 33-34; 51-52. DaSilva also showed Mora how to use Hans Kissle's chicken and egg grinding machines. Id. at 67-69. DaSilva assigned Mora his duties at Hans Kissle, including on the day of the accident, when he told Mora to use the ham grinding machine. Id. at 29-31; Ex. N, DaSilva Depo. at 44-45.

Hans Kissle's full-time employees Bob Pobiedzinksi ("Bob P.") and Kevin Barner investigated Mora's accident. Exhibit P, Deposition of Robert Pobiedzinski ("Pobiedzinksi Depo.") Vol. II at 153.  Bob P. prepared an accident report regarding Hans Kissle's findings. Ex. P, Pobiedzinski Depo., Vol. I at 101-102.  Hans Kissle also held a safety meeting for all full-time and temporary employees regarding Mora's accident and to discuss not putting hands in equipment, making sure all machine guards are used and reporting any problems with machines. Ex. P, Pobiedzinski Depo., Vol.  at 117-119.

In contrast to Hans Kissle's relationship with Mora, Preferred's employees responsible for the Hans Kissle account did not even know who Mora was before the accident.  Preferred's owner, Martin Rubeo, testified that he did not know who Mora was and had never met him:

Q.  Do you know who Julio Mora is?
A.  No.
Q.  Okay.  Prior to April 20th of 2007 had you ever met Julio Mora...
A.  No.

Ex. K, Rubeo Depo. at 22. Likewise, Brendan Gurry, Preferred's "liaison" with Hans Kissle, testified he had no idea who Mora was.  Ex. I, Gurry Depo. at 36, 39-40.

Mora's testimony in this regard is illuminating.  Mora testified that he worked "as a temporary employee for various places through Preferred Staffing." Ex. M, Mora Depo. Vol. II at 153.  Preferred did not make anything available to him that he "could read that told [him] about the companies and the jobs that were available." Id. at 174.  In fact, Mora did not even know the names of the only people with whom he interacted at Preferred, namely, a man who called him when work was available, and another man who drove the van that took him to Hans Kissle. Id. at 167-171.  The first time that Mora was sent to Hans Kissle, the man from Preferred "didn't say anything to" Mora, "didn't tell [Mora] where [he was] going or what [he] would be doing," and Mora did not ask.  Id. at 173-174.  Indeed, the first time he went to Hans Kissle,

Mora reported to "Hugo [DaSilva]," who told him what his job was going to be and was his "boss" or "supervisor" thereafter. Id. at 174-175; Ex. M, Mora Depo. Vol. I at 50.

## STANDARD OF REVIEW

A motion to dismiss requires the Court to accept "the factual averments contained in the complaint as true, indulging every reasonable inference helpful to the plaintiff's cause." Garita Hotel Ltd. Partnership v. Ponce Fed. Bank, F.S.B., 958 F.2d 15, 17 (1st Cir. 1992); see also Pihl v. Massachusetts Dep't of Educ., 9 F.3d 184, 187 (1st Cir. 1993). A motion to dismiss must be denied if a claimant can recover on any viable theory. Rumford Pharmacy, Inc. v. City of East Providence, 970 F.2d 996, 998 (1st Cir. 1992). As set forth below, this Court should deny National Union's Motion to Dismiss because there are facts that support a viable theory of liability against National Union.

Moreover, the uncontested facts themselves[10] provide a basis for awarding summary judgment in favor of the Plaintiffs. Fed. R. Civ. P. 56(c). The party moving for summary judgment bears the initial burden of asserting the absence of a genuine issue of material fact and "support[ing] that assertion by affidavits, admissions, or other materials of evidentiary quality." Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir. 2003). "Once the moving party avers the absence of genuine issues of material fact, the nonmovant must show, through materials of evidentiary quality, that such a dispute exists.'" Cordero-Soto v. Island Finance, Inc., 418 F.3d 114, 119 (1st Cir. 2005) (quoting Rathbun v. Autozone, Inc., 361 F.3d 62, 66 (1st Cir. 2004)). In this case, the clear factual evidence indicates that National Union's declination of coverage under the applicable insurance policy was erroneous and Plaintiffs are entitled to summary judgment on Counts I, II, III and V of their Amended Complaint.

---

[10]See Plaintiffs' Statement of Undisputed Facts Pursuant To Local Rule 56.1 In Support Of Plaintiffs' Motion For Summary Judgment

**ARGUMENT**

In denying coverage under the Policy for the underlying litigation, and in its Motion to

Dismiss, National Union relies on an exclusion found in Endorsement No. 3 to the Policy

(hereinafter referred to as "the Exclusion"). <u>Exhibit F</u>, The Policy, Endorsement No. 3. The

Exclusion upon which National Union relies excludes coverage for claims:

> arising out of **Bodily Injury** or **Wrongful Act** to any **Employee** arising out of and in the
> course of:
> 1. employment by **you**;
> 2. the performance of duties related to the conduct of **your** business[.]

<u>Ex. F</u>, The Policy, Endorsement No. 3. (Emphasis in original.)  Section XII (27) of the Policy

defines "you" as the "… corporation designated as Named Insured in Item 1 of the

Declarations." <u>Id.</u>, Section XII (27) of the Policy. The Named Insured in item 1 of the

Declarations is Preferred Staffing, Inc. and no other entity.

    A.  The Intentional Narrowing Of The Exclusion Demonstrates That Coverage Is Excluded
        Only Where An Individual Is Hurt While Working Directly For Preferred.

The Policy's plain language shows that coverage is excluded only where an individual is

hurt while working directly for Preferred.  Since "you" is only defined as Preferred, the

Exclusion excludes coverage only where an employee is employed by [Preferred] in performance

of duties related to the conduct of [Preferred's] business. Insurance contracts like the Policy in

this case "are read according to their plain language." <u>Essex Ins. Co. v. Carroll Adver. Co.</u>, 268

F. Supp. 2d 75, 79 (D. Mass. 2003).  If Mora were an employee of someone other than Preferred

at the time of his accident, then the Exclusion would not apply.

Under the plain meaning of words rule, National Union could have broadened the scope

of this exclusion to include parties such as Hans Kissle; **indeed, the plain meaning**

**interpretation of the prior language of the same Exclusion would have excluded Hans**

**Kissle.**

Specifically, the Exclusion had previously been amended to its present language. The

prior wording excluded coverage for bodily injury to:

1. An employee of the Insured arising out of and in the course of:
   a. Employment by the Insured; or
   b. The performance of duties related to the conduct of the Insured's business…

Ex. F, The Policy, p. 5 (Exclusion E). "Employment by the Insured" was changed[11] to

"Employment by you." "Performance of duties related to the conduct of the Insured's

business…" was changed to "performance of duties related to the conduct of your business."

Whereas the prior or first instance version of this exclusion was broad enough to include Hans

Kissle as an "insured" under the policy, the exclusion in force at the time of Mora's accident

narrowed the exclusion to include only Preferred Staffing (defined as "you").[12]   As such, the

clear intent of the current version of the Exclusion is to reduce the scope so that it does not apply

to an injury to an individual employed by one of Preferred's clients, such as Hans Kissle.

National Union's interpretation of Endorsement  No. 3, which excludes claims relating to

employment by any Insured, including Hans Kissle, rather than only Preferred, is not only

contrary to its plain language, but also renders it superfluous:  National Union would have

Endorsement No. 3 exclude the same claims that would have been excluded under the Policy's

---

[11] This change takes place in Endorsement 3 of The Policy, which modifies the original, broader exclusion set forth
in the Policy at page 5.
[12] The Policy's definition of an Insured is much broader than its definitions of "you" and "your," which, as set forth
above, mean only the Named Insured, Preferred.  The definition of Insured, by contrast, includes not only Preferred
as the Named Insured (See Section VIII.(1)(c)) but also, by virtue of Endorsement No. 1, the Blanket Additional
Insured Endorsement, "[a]ny person or organization as required by your [Preferred's] contract or agreement…" Ex.
F, The Policy, Endorsement No. 1. Because the Indemnity and Insurance Agreement between Preferred and Hans
Kissle required Preferred to name Hans Kissle as an additional insured, Hans Kissle qualifies as an Insured under the
policy through the Blanket Additional Insured Endorsement. Therefore, the definition of Insured includes both
Preferred and Hans Kissle, while the definitions of "you" and "your" are restricted solely to Preferred.  Under the
older version of this exclusion, Hans Kissle would have been excluded.

original language.  Such an interpretation cannot stand because it runs afoul of the Policy's plain

meaning, as well as the admonitions that each word of the Policy is presumed to have been

chosen with a purpose and each provision is to be given effect.  As such, the exclusion provided

for by Endorsement No. 3 must be narrower than that contained within the Policy's original

language.

     Thus, the plain language of the endorsement and the history of the drafting of the

Exclusion further show the intention to limit the exclusion to employees of Preferred while

performing duties related to the conduct of Preferred's business.  As further set forth below, at

the time of the accident Mora was Hans Kissle's employee as a matter of law and was

performing duties related to the conduct of Hans Kissle's business, not of Preferred's.

    B.  Mora Was An Employee of Hans Kissle Performing Duties Related to the Conduct of
        Kissle's Business Because Kissle Hired, Trained, Supervised, Directed And Controlled
        The Performance Of His Work And Had The Right To Fire Him.

     National Union argues that Mora was Preferred's employee within the meaning of the

Policy.  The Policy, however, does not define the term "employee" other than to state that the

term includes a leased worker and a temporary employee but does not include a temporary

worker.[13] Ex. F, Policy, Section XII (6).  This is a list of different classes of employees, not a

definition.  As such, whether or not Mora was Preferred's employee and, consequently, whether

or not the Exclusion is applicable, depends on the definition of employee under Massachusetts

law.[14]

---

[13] The Policy defines a temporary worker as "a person who is furnished to you [Preferred]..." Exhibit F, Policy,
Section XII.(22).  Mora was furnished by, not to, Preferred, so the Policy's definition of a temporary worker is not
applicable here.
[14] National Union makes a cursory argument that Hans Kissle has conceded that Mora was Preferred's employee in
a letter from its counsel dated February 3, 2010, and attached to the Amended Complaint as Exhibit D.  It has done
no such thing.  National Union conveniently omits that Hans Kissle explicitly stated in that letter that the arguments
contained therein were limited to the Policy's coverage for Preferred's contractual liability, and that Hans Kissle
"reserve[d] all rights to raise additional or alternative arguments" regarding the propriety of National Union's
declination of coverage based on Endorsement No. 3.  Hans Kissle raised those alternative arguments in its letter

In Massachusetts, the identification of an individual's employer is a matter of law when the operative facts are undisputed, as they are here. <u>Fleming v. Shaheen Brothers, Inc.</u>, 71 Mass. App. Ct. 223, 228 (2008), *rev. denied by* 451 Mass. 1105 (2008), citing <u>Schofield's Case</u>, 272 Mass. 229, 231 (1930).[15]   In Massachusetts, an individual is employed by the entity "'who has direction and control of the employee and to whom … he owe[s] obedience in respect of' the performance of his work." <u>Fleming v. Shaheen Brothers, Inc.</u>, 71 Mass App. Ct. at 227, quoting from <u>Patterson v. Liberty Mut. Ins. Co.</u>, 48 Mass. App. Ct. 586, 591 n.13 (2000) (further citation omitted).   While the method of payment may be an important factor, it "is not controlling in determining the terms of an employment relationship." <u>Id.</u>, citing <u>McDermott's Case</u>, 283 Mass. 74, 76 (1933).   Rather, "'[t]he <u>primary test</u> is whether one has a right to control the individual's work performance.'" <u>Id.</u>, quoting from <u>National Ass. of Govt. Employees v. Labor Relations Commn.</u>, 59 Mass. App. Ct. 471, 474 (2003) (emphasis added).

Under controlling Massachusetts law, an entity "**cannot be considered a general employer if it did not exercise any control over [the worker's] work duties; performing payroll functions does not amount to a working relationship.**" <u>Fleming v. Shaheen Brothers, Inc.</u>, 71 Mass. App. Ct. 223, 228-229, *rev. denied by* 451 Mass. 1105 (2008) (emphasis added). Thus, as a matter of Massachusetts law, Mora cannot be considered an employee of Preferred since Preferred never exercised any control over any of Mora's work duties.   In fact, Preferred did not even know who Mora was or what he was doing at Hans Kissle. Under Massachusetts law the company that trains, supervises and controls the day-to-day activities of a worker is that worker's employer, even where a staffing agency handles "administrative functions," such as

---

dated March 19, 2010. *See* <u>Exhibit F</u> to Plaintiffs' Amended Complaint.  Moreover, if National Union is going to take the position that it declined coverage based on this pre-suit statement from its own insured (Hans Kissle qualifies as an additional insured to the Policy), then Hans Kissle must be allowed to immediately amend its complaint to add claims for violation of M.G.L. c. 93A and M.G.L. c. 176D.

[15] A copy of the <u>Fleming</u> opinion is attached hereto for the Court's convenience.

paying the worker's wages, withholding Federal and State taxes, and maintaining unemployment

and workers' compensation insurance. *See* id. at 226, 228.[16]

The facts in the underlying litigation are nearly identical to those in Fleming. The

plaintiff in Fleming alleged that he was injured while working at the premises of Shaheen

Brothers, Inc. ("Shaheen") as an employee of New Boston Select Group ("New Boston"), a

staffing services agency. Id. at 224. Shaheen argued that it was immune from suit under the

Massachusetts Workers' Compensation Act because it, and not New Boston, was the plaintiff's

employer. Id. The Appeals Court agreed and found there was a "direct employment

relationship" between Shaheen and the plaintiff because Shaheen interviewed and hired the

plaintiff, controlled his training, hours and job duties, supervised his work, and indirectly paid

his wages and workers' compensation, and essentially paid New Boston his wages plus an

administrative fee.[17]

As in Fleming, in the case at bar Hans Kissle, not Preferred, had a direct employment

relationship with Mora and set the conditions of his employment. Hans Kissle hired Preferred to

recruit and identify prospective temporary employees, but Hans Kissle retained the right to hire

---

[16] Although not made explicit in Fleming's holding, the Appeals Court strongly implied that the staffing agency issued W-2 forms to temporary workers because it specifically noted that the staffing agency withheld Federal and State taxes. Moreover, in Patterson v. Liberty Mut. Ins. Co., 48 Mass. App. Ct. 586, 591 and 591 n.13 (2000), a case decided on grounds that did not necessitate a determination as to the identity of the plaintiff's employer, the Appeals Court went out of its way to note in an extraordinarily lengthy footnote that where a foundation did not control the plaintiff's daily work activities, but merely paid the plaintiff's salary and fringe benefits, identified the plaintiff as its employee on W-2 forms and other tax and audit documents, such evidence did not support a finding that the foundation was the plaintiff's employer. As such, any argument here that Hans Kissle was not Mora's employer because Preferred paid Mora and issued W-2 forms to him is completely without merit.

[17] Although the staffing agency, New Boston, issued the plaintiff's checks and "formally" paid his wages and workers' compensation benefits—which the Court noted were merely "payroll and administrative functions"— Shaheen paid New Boston for the plaintiff's wages and additional administrative services. Id. at 227-228. The Court found that despite the fact that New Boston paid the plaintiff, deducted payroll taxes and paid workers' compensation benefits, New Boston "had no actual control over hiring, firing, or other work conditions." Id. The Court further found that the plaintiff "did not provide any service" to New Boston. Id. at 228. Thus, the Court concluded that the company that controlled the plaintiff's day-to-day work activities, Shaheen, was the plaintiff's employer. Id.

or reject those applicants. Hans Kissle determined how much it would pay its temporary employees, including Mora, per hour. Hans Kissle established the work-place requirements, including the requirement that specific clothing be worn on the job and provided Mora with his "uniform." Hans Kissle trained Mora with respect to his job duties at Hans Kissle and gave him on-the-job-training to use the ham grinder, egg grinder and chicken grinder. Hans Kissle controlled Mora's activities and assigned him to work as an opener in its salads department. Hans Kissle's supervisors and lead workers told Mora what tasks to perform, including working on the ham grinding machine. Mora's boss was not someone from Preferred but Hans Kissle's lead opener, Hugo DaSilva, who trained him, supervised him and told him what to do.

In addition, Hans Kissle, not Preferred, had the right to fire its temporary workers, including Mora. Like Shaheen in <u>Fleming</u>, Hans Kissle had the right to fire a temporary worker who acted out of line, did something wrong, did not perform to the top of his or her ability, or was simply not working out well at Hans Kissle. Hans Kissle had the right to, and did, instruct Preferred not to send particular workers back to Hans Kissle. Moreover, it is undisputed that when a temporary worker performed well, Hans Kissle had the right to promote the worker and pay him or her a higher hourly wage. The undisputed evidence that Hans Kissle had the right to establish the rate of a temporary worker's compensation, fire temporary workers it was not satisfied with and promote those who did well, demonstrates that Hans Kissle had a direct employment relationship with Mora and its other temporary employees. In effect, Hans Kissle had an "at-will" employment relationship with its temporary workers, who owed it obedience with respect to their work. *See* <u>Fleming</u>, 71 Mass. App. Ct. at 227.

By contrast, Preferred—National Union's own insured—admits that it was in no way responsible for providing any training to the temporary workers that it sent to Hans Kissle.

Preferred did not give any instructions to temporary workers regarding how or what work to perform, nor did it do anything to determine which jobs or tasks they would be assigned to. In fact, Preferred even acknowledges that Hans Kissle controlled the day-to-day work activities of temporary workers and admits that Hans Kissle had the right to assign and reassign temporary workers to different tasks as Hans Kissle saw fit.

The undisputed evidence also shows that the services Preferred provided to Hans Kissle had nothing to do with Mora's day-to-day work there. Hans Kissle hired Preferred to perform the initial interviewing process, but Hans Kissle made the ultimate decision as to which temporary employees would work at its plant based on their résumés or job performance, depending on the specific position. Thus, that Preferred may have initially identified Mora as an individual to be sent to work at Hans Kissle as a temporary worker does not mean that Preferred had any control over Mora's work there. It is undisputed that Preferred did not have any such control.[18] Neither did Preferred's provision of transportation for temporary employees to and from Hans Kissle give it any control over those workers' daily duties at Hans Kissle. Providing transportation does not establish an employer-employee relationship between Preferred and Mora. Transportation was merely a service Hans Kissle paid Preferred to provide.

Finally, Preferred's performance of certain payroll functions did not give it any "actual control over hiring, firing, or other work conditions." Fleming, 71 Mass. App. Ct. at 227. As the Appeals Court held in Fleming, Preferred's issuance of paychecks to Mora, "does not amount to a working relationship" between them. Id. at 228-229. Moreover, it is undisputed that Hans Kissle ultimately paid Mora, as Hans Kissle paid an hourly rate to Preferred for each hour

---

[18] To the extent that National Union may attempt to argue that the Fleming case is distinguishable because the plaintiff in that case had initially been interviewed by Shaheen rather than the staffing service, New Boston, this is a distinction without a difference. Preferred's initial identification of Mora did not give it any control over Mora's work at Hans Kissle or establish an employer-employee relationship between Preferred and Mora. Rather, Preferred merely facilitated and enabled such a relationship between Hans Kissle and Mora.

worked by Mora, and Preferred in turn paid Mora for his work at Hans Kissle out of that amount. *See* id. at 227  Likewise, the staffing agency in Fleming, New Boston, "formally paid [the plaintiff's] wages and workers' compensation benefits, but had no actual control over hiring, firing or other work conditions." Id.  Preferred is analogous to New Boston and Preferred's performance of the same payroll functions here does not mean that Mora was Preferred's employee.

Furthermore, Hans Kissle investigated Mora's accident involving the ham grinder and held a safety meeting for all of its full-time and temporary employees to address Mora's accident.  These types of actions are the sort of steps one would expect an employer to take after an injury to one of its employees.  Significantly, Preferred did not do anything after Mora's accident, and it admits that it did not investigate the accident or take any steps to make sure that other workers would not be injured in the future.  Preferred's lack of response to Mora's accident is perfectly consistent with that of an entity who had been engaged only to handle payroll and other ancillary functions (such as transportation) unrelated to the temporary workers' day-to-day activities as opposed to a direct employer. The contrast between the post-accident activities of Hans Kissle and Preferred provides further uncontested evidence that Mora was Hans Kissle's employee.

In sum, like New Boston in Fleming, Preferred did not have any right to, nor did it, direct or control Mora's day-to-day activities or work performance at Hans Kissle.  Instead, Hans Kissle had a direct employment relationship with Mora because Hans Kissle had the right to, and did, control his day-to-day duties.  Thus, Mora did not provide any services to Preferred, but rather worked for Hans Kissle. *See* Fleming, supra. at 228.  Preferred only helped Mora get to Hans Kissle for his shifts and drafted paychecks for his work there.  Preferred cannot be

considered Mora's employer because "performing payroll functions does not amount to a working relationship." Id. at 228-229.[19]

Based on the foregoing uncontested facts, it is clear as a matter of law that Mora was an employee of Hans Kissle with respect to his work at Hans Kissle's premises. Mora's injury arose out of and in the course of his employment by Hans Kissle and in the course of the performance of duties related to the conduct of Hans Kissle's business, namely, food manufacturing, not the business of Preferred.[20] Therefore, the Policy's Endorsement No. 3, relied upon by National Union in declining coverage and cited in its Motion to Dismiss, does not apply because Mora's injury neither arose out of his employment by Preferred nor occurred during the performance of duties related to the conduct of Preferred's business. Because it does not apply at all, Endorsement No. 3 does not "delete the insured contract language," as argued by National Union. As a result, their motion to dismiss must be denied and our motion for summary judgment in our favor must be entered.[21]

C.   Count IV Properly Seeks A Declaratory Judgment that Plaintiff's Breach Of Contract Claim Against Preferred Is Covered Under The Policy.

National Union contends that the Plaintiffs may not maintain under Count IV of their Amended Complaint a so-called "direct action" against National Union without first obtaining a

---

[19] Hans Kissle did have workers compensation insurance. See Affidavit of Chuck O'Donnell, ¶¶ 3-4. The fact that Preferred's insurer paid a workers compensation claim does not make Preferred his employer. See, for instance, Wentworth v. Henry C. Becker Custom Bldg., Ltd., 76 Mass. App. Ct. 507, 512 (2010) (payment of workers compensation claim does not render general contractor "employer" entitled to workers compensation bar).

[20] The Plaintiffs have no burden to show that Mora was not an employee of Preferred at some other time since the Policy excludes coverage only when an employee is injured in the course of his/her employment by Preferred or in the performance of duties related to the conduct of Preferred's business. See Exhibit F, Policy Endorsement No. 3. It is well-established in Massachusetts law that a worker may have multiple employers. Williams v. Westover Finishing Co., 24 Mass. App. Ct. 58, 60-62, rev. denied by 400 Mass. 1002 (1987). Thus, even if it could be argued that Mora was also Preferred's employee at some other time, the exclusion contained within Endorsement No. 3 is inapplicable because Mora was injured during the course of his employment by Hans Kissle and while performing duties related to the conduct of Hans Kissle's business.

[21] As a matter of law, the undisputed facts favor summary judgment for the Plaintiffs. However, if this Court views that a question of fact exists as to whether or not Mora was an employee of Hans Kissle, then such a question of fact is to be decided by a jury and the denial of National Union's motion to dismiss is therefore appropriate.

judgment against Preferred. However, Count IV is not a direct action against National Union but rather a request for a declaration that a recovery for breach of contract against its insured is covered under the subject policy. A declaratory judgment in a breach of contract action provides an appropriate means of deciding a dispute concerning the meaning of language in an insurance policy. See, e.g., Boston Symphony Orchestra, Inc. v. Commercial Union Ins. Co., 406 Mass, 7, 15-16 (1989). The purpose of a declaratory judgment action is "to provide a plaintiff relief from uncertainty and insecurity with respect to rights, duties, status and other legal relations." Sahli v. Bull HN Info. Sys., Inc., 437 Mass. 696, 705 (2002). The "direct action" cases cited by National Union in its motion to dismiss are distinguishable because they are based in tort where 1) the plaintiff has no relationship or privity to the insurer and 2) issues of insurance have no bearing on the liability of the tortfeasor in the underlying case. In the present contract case, Hans Kissle and OneBeacon contend that they are insureds under National Union's policy and are no strangers to the insurance contract they seek to enforce. Moreover, a central issue in the underlying Hans Kissle-Preferred Staffing contract case involves whether or not Preferred obtained insurance as required under the Indemnity and Insurance Agreement. In many ways, the question before this Court – whether Hans Kissle is an insured under the National Union policy – must be determined before, not after, the underlying breach of contract case because if this Court finds that Hans Kissle is covered under the policy, then there is no breach of contract by Preferred in the case currently pending in Essex Superior Court. Likewise, if this court makes a finding that Hans Kissle is not an insured under the policy, then by definition Preferred Staffing breached its agreement with Hans Kissle and the only issue remaining is whether the breach of contract is covered under the contractual liability provision in the Policy.

**WHEREFORE,** Hans Kissle and OneBeacon respectfully request that this Honorable

Court DENY National Union's Motion to Dismiss Amended Complaint Pursuant to Fed. R. Civ.

P. 12(b)(6) and GRANT Hans Kissle's and OneBeacon's Cross-Motion for Summary Judgment.

Respectfully submitted,

Plaintiffs, Hans Kissle Company, LLC and
OneBeacon America Insurance Company
By their attorneys,

/S/ Kevin J. O'Leary

Emily G. Coughlin, Esq. BBO #554526
Christopher G. Betke, BBO #552588
Kevin J. O'Leary, BBO #559694
Coughlin Betke LLP
175 Federal Street
Boston, MA 02110
(617) 988-8050
ecoughlin@coughlinbetke.com
cbetke@coughlinbetke.com
koleary@coughlinbetke.com

Dated:   __**10/22/10**____

## Certificate of Service

I, Kevin J. O'Leary, do hereby certify that on this 22nd day of October, 2010, I served a copy of the within
document electronically and via first class mail, postage prepaid to: John D. Hughes and Eric B. Hermanson
(jhughes@eapdlaw.com,ehermanson@eapdlaw.com) Edwards Angell Palmer & Dodge LLP, 111 Huntington
Avenue, Boston, MA 02199.

/S/ Kevin J. O'Leary

Kevin J. O'Leary, Esq.



LEXSEE 71 MASS. APP. CT. 223



Positive
As of: Oct 21, 2010

## MARK FLEMING & another [1] vs. SHAHEEN BROTHERS, INC., & another. [2]

1  Michelle Fleming.
2  Crown Equipment Corporation, also known as Crown Controls Corporation.

### 07-P-255

### APPEALS COURT OF MASSACHUSETTS

### *71 Mass. App. Ct. 223; 881 N.E.2d 1143; 2008 Mass. App. LEXIS 183*

**December 10, 2007, Argued**
**February 21, 2008, Decided**

**SUBSEQUENT HISTORY:**    As Corrected April, 2, 2008
Review denied by *Fleming v. Shaheen Bros., 451 Mass. 1105, 885 N.E.2d 835, 2008 Mass. LEXIS 382 (2008)*

**PRIOR HISTORY:** [***1]
Essex. Civil action commenced in the Superior Court Department on October 22, 1998. A motion for partial summary judgment was allowed by Issac Borenstein, J., on August 29, 2002, and entry of judgment was ordered by Howard J. Whitehead, J., on December 27, 2006.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, an employee and his wife, appealed a judgment from the Superior Court Department, Essex (Massachusetts), which granted partial summary judgment (SJ) to defendant putative employer (PE) on plaintiffs' claims of negligence and breach of warranty, arising from injuries sustained by the employee while operating a forklift manufactured by defendant equipment company (EC). The PE appealed the entry of a judgment on the SJ ruling.

**OVERVIEW:** The employee worked as a temporary employee for the PE, although he was paid by a different employer (DE). The employee alleged that the forklift accident occurred while he was on the PE's premises. He filed his action against the PE and the EC, alleging that the EC was liable for negligent design and breach of warranty. The employee alleged that he worked for the DE at the time. The trial court granted SJ to the PE on the claims against it. It held that as the PE controlled and directed the employee's work and was liable for payment of the employee's workers' compensation benefits, it was immune from liability under the Workers' Compensation Act, Mass. Gen. Laws ch. 152. The employee and the EC settled, those claims were dismissed, and a judgment entry on the SJ was issued. On appeal, the court initially held that entry of final judgment was not improper under *Mass. R.Civ.P. 58(a)* despite the delay in applying for it. The grant of SJ to the PE was proper, as the DE was only used for payment purposes. Under the two-part immunity test under *Mass. Gen. Laws ch. 152, § 1(4)* and *(5)*, the PE had the direct employment relationship and was liable for compensation payments.

**OUTCOME:** The court affirmed the grant of SJ to the PE.

**LexisNexis(R) Headnotes**

Page 2

71 Mass. App. Ct. 223, *; 881 N.E.2d 1143, **;
2008 Mass. App. LEXIS 183, ***

*Civil Procedure > Judgments > Entry of Judgments > General Overview*
[HN1] A delay in applying to a court for formal entry of a separate document of judgment under *Mass. R.Civ.P. 58* does not constitute a waiver of the right to have such judgment entered.

*Civil Procedure > Summary Judgment > Standards > General Overview*
[HN2] The standard of review of a grant of summary judgment is whether, viewing the evidence in the light most favorable to a nonmoving party, all material facts have been established and the moving party is entitled to a judgment as a matter of law.

*Workers' Compensation & SSDI > Defenses > Exclusivity Provisions*
*Workers' Compensation & SSDI > Remedies Under Other Laws > Exclusivity > Employees & Employers*
[HN3] A two-part test determines whether an employer is immune from liability under the workers' compensation statute, Mass. Gen. Laws ch. 152. A direct employment relationship must exist, and the employer must be an insured person liable for the payment of compensation.

*Workers' Compensation & SSDI > Coverage > Employment Relationships > Employees*
*Workers' Compensation & SSDI > Coverage > Employment Relationships > Employers*
*Workers' Compensation & SSDI > Remedies Under Other Laws > Exclusivity > Employees & Employers*
[HN4] *Mass. Gen. Laws ch. 152, § 1(4),* inserted by 1935 Mass. Acts ch. 406, defines an employee as every person in the service of another under any contract of hire, express or implied, oral or written. *Section 1(5)* defines an "employer" as an individual, partnership, association, corporation or other legal entity employing employees subject to Mass. Gen. Laws ch. 152.

*Workers' Compensation & SSDI > Defenses > Exclusivity Provisions*
*Workers' Compensation & SSDI > Remedies Under Other Laws > Exclusivity > Employees & Employers*
[HN5] As to the first part of the test to determine whether workers' compensation immunity applies, in order to determine whether an employer-employee relationship exists, the finder of fact must identify who has direction and control of an employee and to whom does he owe obedience in respect of the performance of his work. Method of payment for work, though important, is

not controlling in determining the terms of an employment relationship. The primary test is whether one has a right to control the individual's work performance.

*Contracts Law > Types of Contracts > Implied-in-Fact Contracts*
[HN6] An implied contract can be inferred from the conduct of the parties where one agrees to render services in exchange for payment by the other.

*Workers' Compensation & SSDI > Remedies Under Other Laws > Exclusivity > Employees & Employers*
[HN7] Where the underlying facts are not disputed, whether an entity is an employer for purposes of workers' compensation immunity is a matter of law for a court.

*Workers' Compensation & SSDI > Coverage > Employment Relationships > Employers*
*Workers' Compensation & SSDI > Defenses > Exclusivity Provisions*
*Workers' Compensation & SSDI > Remedies Under Other Laws > Exclusivity > Employees & Employers*
[HN8] Under *Mass. Gen. Laws ch. 152, § 18,* a general employer upon whom liability for making workers' compensation payments has been placed shall have the burdens and immunities of the Workers' Compensation Act; the other special employer will have neither.

*Workers' Compensation & SSDI > Coverage > Employment Relationships > Employers*
*Workers' Compensation & SSDI > Defenses > Exclusivity Provisions*
*Workers' Compensation & SSDI > Remedies Under Other Laws > Exclusivity > Employees & Employers*
[HN9] See *Mass. Gen. Laws ch. 152, § 18,* inserted by 1969 Mass. Acts ch. 755, § 2.

*Workers' Compensation & SSDI > Defenses > Exclusivity Provisions*
*Workers' Compensation & SSDI > Remedies Under Other Laws > Exclusivity > Employees & Employers*
[HN10] To satisfy the second prong of the workers' compensation immunity test, an insured person must only be "liable for the payment of compensation." An employer need not actually pay the insurance premiums to benefit from the workers' compensation exclusivity bar.

**HEADNOTES**

71 Mass. App. Ct. 223, *; 881 N.E.2d 1143, **;
2008 Mass. App. LEXIS 183, ***

*Practice, Civil*, Summary judgment. *Workers' Compensation Act*, Action against employer, Recovery from third person. *Contract*, Implied contract, Employment. *Words*, "Employee," "Employer."

**COUNSEL:** Thomas J. Gleason, for the plaintiffs.

Emily G. Coughlin, for Shaheen Brothers, Inc.

**JUDGES:** Present: Gelinas, Smith, & Sikora, JJ.

**OPINION BY:** SMITH

**OPINION**

[**1144]   [*224] SMITH, J. The plaintiffs, Mark Fleming (Fleming) and his wife, Michelle Fleming, filed an action in the Superior Court against the [**1145] defendants, Shaheen Brothers, Inc. (Shaheen), and Crown Equipment Corporation, also known as Crown Controls Corporation (Crown), alleging that Fleming was injured on Shaheen's premises while operating a forklift, designed and manufactured by Crown. The complaint was in six counts, three counts against Shaheen, alleging negligence (counts I and II), and breach of warranty (count III), and two counts against Crown, alleging negligent design and breach of warranty (counts IV and V). Count VI was filed by Fleming's wife against both Shaheen and Crown for loss of consortium. In the complaint, Fleming alleged that when he was injured, New Boston Select Group, Inc. (NBS), was his [***2] employer, not Shaheen.

Shaheen filed a motion for summary judgment on counts I and II claiming that it was Fleming's employer and, therefore, pursuant to the Workers' Compensation Act, *G. L. c. 152*, it was immune from an action for damages arising from his injury. The motion judge ruled that because Shaheen controlled and directed Fleming's work, and because Shaheen was liable for payment of Fleming's workers' compensation benefits, Shaheen was immune from suit pursuant to c. 152. Shaheen's motion for summary judgment was allowed on August 29, 2002. No motion for separate entry of judgment pursuant to *Mass.R.Civ.P. 54(b)*, 365 Mass. 820 (1974), was filed at that time.

The case thereafter proceeded against Crown. Fleming and Crown settled in October, 2004, and filed a stipulated dismissal with prejudice pursuant to *Mass.R.Civ.P. 41(a)*, 365 Mass. 803 (1974). On October 27, 2006, Fleming filed a motion for entry of judgment as to the summary judgment in favor of Shaheen. That motion was allowed over Shaheen's objections, and a final judgment entered in December, 2006. Fleming appealed from so much of the judgment as pertained to the dismissal of his first two claims against Shaheen; Sha-

heen [***3] cross-appealed from the order allowing Fleming's motion for entry of judgment. In its cross appeal, Shaheen argues that Fleming's right to appeal terminated within thirty days of the filing of the stipulation of voluntary dismissal under *Mass.R.Civ.P. 41(a)*, which was docketed on October 26, 2004. Relying on *Mass.R.Civ.P. 58(a)*, [*225] as amended, 371 Mass. 908 (1977), Shaheen claims the dismissal, upon being filed, constituted the judgment for all purposes, and that no separate document was necessary. This is so, Shaheen argues, either because the dismissal pertained to the entire action, as its somewhat expansive language arguably suggests, or because it disposed of all the remaining claims in the case following the 2002 dismissal by summary judgment of the negligence counts against Shaheen.[3]

3   Although the issue is not raised by either party, the record does not disclose that counts III and VI against Shaheen, for breach of warranty and loss of consortium, were ever adjudicated or dismissed. These counts inferrably rise or fall on the disposition of the negligence claims against Shaheen which were dismissed in the December 28, 2006, judgment. We therefore consider the appeal despite the [***4] absence of the "express determination" required by *Mass.R.Civ.P. 54(b)*, as doing so here not undermine the purpose of the rule, i.e., "to avoid the possible injustice of a delay in entering judgment on a *distinctly separate claim* . . . until the final adjudication of the entire case by making an immediate appeal available." *Long v. Wickett*, 50 Mass. App. Ct. 380, 383 n.5, 737 N.E.2d 885 (2000), quoting from 10 Wright, Miller & Kane, Federal Practice and Procedure § 2654, at 33 (1998) (emphasis added).

Our review of the record convinces us that the stipulation of dismissal, signed by the attorneys for Crown and Fleming, settled the dispute between those two parties only, despite its broad language.   [**1146]   This conclusion is supported by the transcript of the October 8, 2004, settlement hearing, at which the judge stated that he would await a motion for entry of final judgment as to Shaheen, which counsel for Shaheen stated he had. Notwithstanding counsel's assurance, no motion for entry of final judgment was filed until 2006. Contrary to Shaheen's assertion, entry of the final judgment in December, 2006, was not improper under *Mass.R.Civ.P. 58(a)*, as [HN1] the delay in applying to the court "for formal entry of [***5] a separate document of judgment under *rule 58* does not constitute a waiver of the[] right to have such judgment entered." *Zielinski v. Connecticut Valley Sanitary Waste Disposal, Inc.*, 70 Mass. App. Ct. 326, 330, 873 N.E.2d 1207 (2007) (seven-year delay from allowance of defendant's motion for summary judgment,

71 Mass. App. Ct. 223, *; 881 N.E.2d 1143, **;
2008 Mass. App. LEXIS 183, ***

and plaintiffs' motion for entry of judgment). Concluding it is properly before us, we proceed to address the merits of Fleming's appeal, and affirm the summary judgment entered below.

*Facts.* Sometime before March, 1998, Fleming went to Shaheen's [*226] premises to apply for a warehouse job. Fleming completed an application for employment and interviewed with Shaheen's operations manager. Shaheen hired Fleming as a temporary employee to work in its warehouse, and set his hourly wage. Fleming was trained by Shaheen's staff; he worked on the warehouse's premises and was under the direction of Shaheen employees. After Fleming's first ninety days of employment, Shaheen had the exclusive right to decide whether to continue Fleming's temporary employment or make him a permanent employee. Shaheen could fire him at any time.

Shaheen regularly used NBS to pay its temporary employees, like Fleming, and to handle [***6] related administrative functions. Shaheen paid NBS an amount equivalent to Fleming's salary, plus a service fee. In return, NBS paid Fleming's wages, withheld Federal and State taxes, and provided unemployment insurance. NBS also paid the workers' compensation insurance premiums for Fleming, although he was also covered under Shaheen's workers' compensation policy.

NBS obtained all the information necessary to conduct its payroll through applications which NBS provided to Shaheen. Similarly, Fleming recorded his hours on a time sheet, which Shaheen provided to NBS. Fleming had no contact with NBS, was never introduced to anyone from NBS, had never been to any NBS location, and only discovered its name when he received his first paycheck. Two weeks after he was hired, Fleming was injured in a work-related accident while operating a forklift. Shaheen notified NBS about the accident and NBS filed the "first report of injury" with the Division of Industrial Accidents. Fleming then began receiving workers' compensation benefits from NBS's insurer.

*Standard of review.* [HN2] "The standard of review of a grant of summary judgment is whether, viewing the evidence in the light most favorable to the [***7] non-moving party, all material facts have been established and the moving party is entitled to a judgment as a matter of law." *Augat, Inc. v. Liberty Mut. Ins. Co., 410 Mass. 117, 120, 571 N.E.2d 357 (1991)*, citing *Mass.R.Civ.P. 56(c)*, 365 Mass. 824 (1974).

*Discussion.* [HN3] A two-part test determines whether an employer is immune from liability under the workers' compensation statute, [*227] *G. L. c. 152.* See *Lang v. Edward J. Lamothe Co., 20 Mass. App. Ct. 231, 232, 479 N.E.2d 208 (1985).* "[A] direct employment relationship must exist, and 'the employer must be an insured person liable for the payment of compensation.'" *Numberg v. GTE Transp., Inc., 34 Mass. App. Ct. 904, 904,* [**1147] *607 N.E.2d 1 (1993)*, quoting from *Lang, supra.* In this case, Shaheen was Fleming's employer and liable for his workers' compensation payments. Therefore, Shaheen is immune from Fleming's negligence suit.

[HN4] *General Laws c. 152, § 1(4),* inserted by St. 1935, c. 406, defines an "employee" as "every person in the service of another under any contract of hire, express or implied, oral or written. . . ." *General Laws c. 152, § 1(5),* defines an "employer" as "an individual, partnership, association, corporation or other legal entity . . . employing employees subject to this chapter. [***8] . . ."

[HN5] As to the first part of the test, in order to determine whether an employer-employee relationship exists, "the finder of fact must identify 'who has direction and control of the employee and to whom does he owe obedience in respect of' the performance of his work." *Patterson v. Liberty Mut. Ins. Co., 48 Mass. App. Ct. 586, 591 n.13, 723 N.E.2d 1005 (2000)*, quoting from *Chisholm's Case, 238 Mass. 412, 419, 131 N.E. 161 (1921).* Method of payment for work, though important, is not controlling in determining the terms of an employment relationship. *McDermott's Case, 283 Mass. 74, 76, 186 N.E. 231 (1933).* "The primary test is whether one has a right to control the individual's work performance." *National Assn. of Govt. Employees v. Labor Relations Commn., 59 Mass. App. Ct. 471, 474, 796 N.E.2d 856 (2003).*

Here, there was a direct employment relationship between Shaheen and Fleming. It is not disputed that Shaheen independently interviewed and hired Fleming, exclusively controlled Fleming's training, hours and job duties, supervised Fleming's work and indirectly paid his wages and workers' compensation benefits. NBS, on the other hand, formally paid Fleming's wages and workers' compensation benefits, but had no actual control over hiring, firing, [***9] or other work conditions. [4] Fleming never had any contact with NBS prior to the accident other than receiving [*228] paychecks from its payroll department. All information collected by NBS from Fleming, through Shaheen, related to payroll and administrative functions.

4 Fleming argues that NBS had, by virtue of the contract between Shaheen and NBS, at least a theoretical ability to hire and fire him. However, the contract between NBS and Shaheen is not in the record. Whether NBS could fire Fleming is a significant point because the employment issue turns on whether NBS had a right of control over Fleming. There is nothing in the materials before

Page 5

71 Mass. App. Ct. 223, *; 881 N.E.2d 1143, **;
2008 Mass. App. LEXIS 183, ***

the motion judge that raises the claim to a material issue of fact on this question.

Furthermore, there is nothing in the record that demonstrates an implied employment contract between Fleming and NBS. [HN6] An implied contract can be inferred from the conduct of the parties where one agrees to render services in exchange for payment by the other. See *Cameron v. State Theatre Co., 256 Mass. 466, 468, 152 N.E. 880 (1926).* Fleming did not provide any service to NBS and NBS only provided a payroll service for Shaheen. [HN7] Where the underlying facts are not disputed, whether an [***10] entity is an employer is a matter of law for the court. See *Schofield's Case, 272 Mass. 229, 231, 172 N.E. 346 (1930).* Here, based on the record, the motion judge properly concluded that Shaheen employed Fleming, satisfying the first portion of the immunity test.

Fleming contends that Shaheen was not liable for his workers' compensation benefits, as required by the second prong of the workers' compensation immunity test, because he was leased by his "general employer" (NBS), to a "special [**1148] employer" (Shaheen). [5] [HN8] "Under *§ 18* the [general] employer upon whom liability for making workers' compensation payments has been placed shall have the burdens and immunities of the Act; the other [special] employer will have neither." Nason, Koziol & Wall, Workers' Compensation § 7.17, at 168 (3d ed. 2003). See *Numberg v. GTE Transp., Inc., 34 Mass. App. Ct. at 905.*

5  *General Laws c. 152, § 18,* inserted by St. 1969, c. 755, § 2, provides: [HN9] "In any case where there shall exist with respect to an employee a general employer and a special employer relationship, as between the general employer and the special employer, the liability for the payment of compensation for the injury shall be borne by

the general employer or [***11] its insurer, and the special employer or its insurer shall be liable for such payment if the parties have so agreed. . . ."

In this case, however, there are no facts indicating that NBS was Fleming's general employer. NBS cannot be considered a general employer if it did not exercise any control over Fleming's work duties; performing payroll functions does not amount [*229] to a working relationship. See *Cameron v. State Theatre Co., 256 Mass. at 468* (control and actions of the parties determine employment relationship). Unlike the worker in *Ramsey's Case, 5 Mass. App. Ct. 199, 200-203, 360 N.E.2d 911 (1977),* where the court held that the general employer was responsible for workers' compensation benefits despite the special employer's control over the employee, here, Fleming was not placed by NBS at Shaheen and did not have any prior connection to NBS.

Furthermore, NBS's payment of Fleming's workers' compensation insurance has no bearing on the issue of immunity. [HN10] To satisfy the second prong of the immunity test, the insured person must only be "liable for the payment of compensation." *Lang v. Edward J. Lamothe Co., 20 Mass. App. Ct. at 232.* The employer need not actually pay the insurance premiums to benefit [***12] from the workers' compensation exclusivity bar. *Ibid.* Here, Shaheen carried its own workers' compensation insurance which it paid for as the named insured. It also paid NBS the cost of additional workers' compensation coverage for those Shaheen employees paid through NBS.

We affirm the allowance of Shaheen's motion for summary judgment and deny Shaheen's motion for double costs and attorney's fees.

*So ordered.*